# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 8, 2014 Session

## STATE OF TENNESSEE v. DAVID RICHARDSON

**Appeal from the Criminal Court for Shelby County**
**Nos. 11-02623, 11-07432     Honorable Lee V. Coffee, Judge**

---

**No. W2013-01763-CCA-R3-CD  - Filed November 20, 2014**

---

The Defendant-Appellant, David Richardson, was convicted as charged by a Shelby County Criminal Court jury in case number 11-07432 of first degree premeditated murder and in case number 11-02623 of twelve counts of attempted first degree murder (counts 1-12), twelve counts of aggravated assault (counts 14-25), one count of employment of a firearm during the attempt to commit a dangerous felony (count 27), and one count of reckless endangerment committed with a deadly weapon (count 30).[1]  The trial court sentenced Richardson to life imprisonment for the first degree murder conviction.  It also sentenced Richardson to eighteen years at thirty percent release eligibility for each of the attempted first degree murder convictions, five years at thirty percent release eligibility for each of the aggravated assault convictions, six years at one hundred percent release eligibility for the employment of a firearm during the attempt to commit a dangerous felony conviction, and two years at thirty percent release eligibility for the felony reckless endangerment conviction. The court ordered the sentences for the attempted first degree murder convictions served consecutively to one another, consecutively to the sentence of life imprisonment, and consecutively to the sentences in counts 27 and 30 but concurrently with the sentences in counts 14 through 25, for an effective sentence of life imprisonment plus 224 years.  On appeal, Richardson argues:  (1) the trial court's response to two questions from a juror during trial invaded the province of the jury and improperly commented on the evidence; (2) the trial court committed plain error by informing the jury venire that the State was not seeking the death penalty or a sentence of life imprisonment without parole; (3) the trial court committed plain error in instructing the jury that the testimony of one witness is sufficient to support a conviction; (4) the evidence is insufficient to sustain the first degree premeditated murder conviction, the attempted first degree murder convictions, and the aggravated assault convictions in counts 16, 17, 18 and 20 through 25; and (5) the trial court abused its discretion in imposing partially consecutive sentences resulting in a sentence of life

---

[1]  Prior to trial, the State entered a nolle prosequi as to counts 13 and 26, which charged Richardson with attempted first degree murder and aggravated assault of victim Kimberly Jamerson.

imprisonment plus 224 years. Upon review, we affirm Richardson's convictions but remand the cause to the trial court for a new sentencing hearing. This hearing is limited to consideration of the factors outlined in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), to determine the propriety of consecutive sentencing in this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Resentencing**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and ROBERT L. HOLLOWAY, JR., SP. J., joined.

Neil Umsted (on appeal) and William D. Massey and Lorna S. McClusky (at trial), Memphis, Tennessee, for the Defendant-Appellant, David Richardson.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Teresa S. McCusker, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The charges in this case arose when David Richardson, Kenneth Brown, and Devon Brown[2] fired more than sixty gunshots at individuals gathered at a party on July 3, 2010. As a result of this shooting incident, Kimberly Jamerson was killed and Lamarcus Moore was injured.

**Trial.** Willie Brooks-Howze testified that at 10:30 or 10:45 p.m. on July 3, 2010, she dropped off her twenty-four-year-old daughter, Kimberly Jamerson, at the home of her sister, Sonja Watkins, which was located at 2706 Northmeade Avenue in Memphis. She said this was the last time she saw her daughter alive because her daughter was shot and killed later that night.

Robrecus Braxton testified that he lived at 2706 Northmeade Avenue, Memphis, Tennessee, in Shelby County, with his mother, Sonja Watkins; his step-father, Felix Williams; his brother, Christopher Braxton; and his two sisters, Amber and Dakarrionah Laury. Robrecus[3] said that on July 3, 2010, his family was preparing for a Fourth of July

_____

[2] David Richardson, Kenneth Brown, and Devon Brown were tried separately.

[3] Because many of the witnesses are family members who share the same last name, we will refer
(continued...)

party at their house the next day. His cousins, Chymia Baker, Jalon Baker, Bianca Nevels, Travis Britton, Rodney Davenport, Terriance Webb; and his uncle, Nakia Greer, were also present during the party preparations on July 3, 2010.

In the afternoon of July 3, 2010, Robrecus observed a green Chevrolet Lumina park in front of his home and saw Richardson and a man later identified as Kenneth Brown, get out of the car. He knew Richardson and Kenneth because they lived nearby and because he had gone to high school with them. Robrecus overheard an argument between Kenneth and his uncle, Nakia Greer, wherein Kenneth claimed that Robrecus's aunt, Dena Watkins, had taken some of his marijuana. During the argument, Felix Williams, told Kenneth and Richardson that Dena Watkins was no longer present at the party. Williams told them to return later, and he would "get the situation handled." Kenneth and Richardson left but drove back to the area a few minutes later with a third man, later identified as Devon Brown. All three men exited the car, and Williams gave them $5.00 to settle Watkins's debt. The three men got back in the Chevrolet Lumina, and as they were leaving the area, their car nearly hit Robrecus, who reacted by throwing a beer can he had been holding into the open window of the car. The Lumina quickly stopped on Ladue Street, and the three men jumped out of the vehicle and began exchanging words with Robrecus. A fistfight eventually broke out with Kenneth Brown, Devon Brown, and Richardson fighting with Robrecus Braxton, Christopher Braxton, and Kenneth Baker. Robrecus stated that neither side had any weapons during the fight and that Williams broke up the fight. As Richardson, Kenneth, and Devon were leaving, one of them said, "All right. That's what's up."

Approximately two hours later, Robrecus heard what he thought were fireworks and saw green and red lights before realizing that the sounds he was hearing were gunshots. He and his friend Lamarcus Moore ran under the carport toward the backyard. When he got to the backyard, Robrecus stood by a wall trying to take cover as the gunshots continued. He could see down the pathway and observed Mark and Steve Chambers standing on Northmeade Avenue returning fire with their own guns. He said Mark and Steve Chambers were the only two people at the party returning fire. Then Robrecus heard Moore say, "I'm hit, I'm hit hard." When the gunshots stopped, he heard Rodney Davenport yell, "Kim['s] been hit." Robrecus ran to the front yard and saw his cousin, Kimberly Jamerson, lying on the sidewalk in front of his house. His friends, Antoine Moore and Rico Chandler, put

---

[3](...continued)
to these witnesses by their first names for clarity. We also acknowledge that, due to the length of this opinion, we do not use titles when referring to every witness. We intend no disrespect by either of these practices. Judge John Everett Williams believes that referring to witnesses by their first names is disrespectful, even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by their proper title.

Robrecus in a car to get help. They found an unmarked police car a short time later and alerted the officer that Kimberly Jamerson had been shot and killed. Robrecus said that at the time the shooting occurred, the following people were in attendance at the party: Antoine Moore; Rico Chandler; Steve Chambers; Mark Chambers; Travis Britton; Kenneth Baker; Jalon Baker; Terriance Webb; Nakia Greer; his mother, Sonja Watkins; his two sisters; his cousin Whitney Henderson; and Lashanna Jones; as well as Jones's children, Shakarla King, Danaria Love, and Danara Love. He said that when he first heard the gunshots, some of the people at the party were inside the house and some were outside under the carport.

Robrecus stated that the gunfire went on for "about ten minutes . . . like it wasn't going to stop." He could tell that the shooters were up the street because of the way the bullets were hitting the cars parked around the Northmeade house. However, he could not see the shooters because it was dark outside. Robrecus said that he was "terrified" and "felt like [his] life was in danger" because the "bullets could have hit anybody." The day after the shooting, Robrecus talked to police about what had happened and identified Richardson in a photographic lineup as one of the men involved in the fistfight prior to the shooting.

Felix Williams testified that when he arrived home on July 3, 2010, everyone was preparing for the Fourth of July party. He said that in addition to his wife and children, the following individuals were present at the party: Dena Watkins, Veronique Watkins, Kenneth Baker, Chymia Baker, and Jalon Baker. Williams said that he was standing outside his house with his kids, his kids' friends, and several nieces and nephews. He heard Dena Watkins ask Nakia Greer where she could purchase some marijuana, and Nakia Greer stopped Kenneth Brown, who was driving down the street, and asked Kenneth if he had any marijuana for sale. At the time, Richardson was riding in the front passenger seat of Kenneth's car. Williams said he knew Richardson because he lived on Ladue Street, which was nearby. Kenneth got out of his car and approached Dena Watkins. They walked around the side of a van, and approximately five minutes later, they reappeared, and Kenneth got back inside his car, with Richardson still in the front passenger seat, and drove around the corner. A short time later, Kenneth and Richardson returned to the party, and Kenneth stopped his car, got out, and asked Nakia Greer if Dena Watkins was around. When Greer told Kenneth that Watkins had just driven past him, Kenneth informed Greer that Watkins had stolen "like a gram of the marijuana[.]" Williams stopped the argument between Kenneth and Greer by telling Kenneth to return later when Watkins was back from the store. When Watkins returned to the party, she told Williams that she had not taken Kenneth's marijuana and then left the party again. When Kenneth Brown, Devon Brown, and Richardson drove back to the Northmeade house ten to fifteen minutes later, all three of the men got out of the car. Kenneth again asked for Watkins, and when Greer told him that she was not there, Kenneth demanded that Greer pay for the marijuana that Watkins had taken. Williams gave Kenneth $5.00 to settle the dispute

and told Kenneth, Devon, and Richardson to "[r]oll because we ain't going to need this around here."

Kenneth, Devon, and Richardson got back into the car. As Kenneth drove away, he nearly pinned Robrecus Braxton between his car and a parked car, and Robrecus reacted by throwing a beer car into Kenneth's car. Kenneth immediately stopped his car on Ladue Street. All three men jumped out of the Lumina, and Kenneth began exchanging words with Robrecus. Robrecus and Kenneth began fistfighting, and when Richardson and Devon tried to jump on Robrecus, Christopher Braxton and Kenneth Baker joined the fight, although neither side displayed any weapons. Williams said he and Greer attempted unsuccessfully to break up the fight. As Williams walked away, he heard glass break when someone threw something at the back window of Kenneth's car. He then heard Kenneth, Devon, or Richardson say, "We'll be back," before getting into Kenneth's car and driving up Ladue Street. After the fight, Williams, Robrecus Braxton, Christopher Braxton, and the other people involved in the fight returned to the house at 2706 Northmeade Avenue.

Williams said that his niece Kimberly Jamerson got to the party around 9:30 or 10:00 p.m. on July 3, 2010. Sometime between 11:00 p.m. and midnight, Williams walked Jamerson down the driveway to the car driving her home. When he turned and began walking up the driveway, he noticed that someone was shooting bottle rockets at his home. One of the bottle rockets hit his shoulder, and one hit a truck directly in front of him. Around ten seconds later, he heard gunshots, and everyone began "running and screaming for their li[ves]." Williams said he could tell that the shots were coming from a house on the hill across the street from his home but he could not see who was firing the shots. During the shooting, the majority of Williams's nieces and nephews were able to get inside the house. Williams said he "panicked" because the shots sounded like they "were getting closer and closer." He ran to the backyard where he saw Lemarcus Moore, who had been shot in the leg. As the shooting continued, Williams helped Moore into the house, where everyone was "hollering and crying." Williams said that his wife had taken the kids back to the bedroom, where she made them lie down on the floor. Williams said that the shooting seemed to go on "for a long time," and he felt like he was "in a war zone." He said he was "[s]cared for [his] life, scared for [his] family" during the shooting. When the gunshots finally stopped, things at his home were "[c]haotic" because "[p]eople were running around . . . trying to make sure everybody was fine." He said his house and van had bullet holes in them, and his son's car, his wife's truck, and his neighbor's house all had been hit by bullets. Once the shooting finally ended, Williams saw Kimberly Jamerson lying on the sidewalk, and he "knew it didn't look good" because he saw "[n]o body movement."

Williams said that they put Lemarcus Moore, who had been shot in the leg, into a car and took him to the hospital. Later, Williams's friend told him that the boys who had fired

the gunshots were Kenneth and Devon Brown. Williams said he "fell to his knees" because Kenneth and Devon Brown's father had been the mechanic who trained him, and he remembered Kenneth and Devon when they were little kids. Williams later gave a statement to police about the incident and identified Richardson from a photographic lineup as the person who sat in the front passenger seat of Kenneth Brown's car and as the person who was involved in the fistfight with Robrecus. He also identified Kenneth Brown from a second photographic lineup as the person who "killed [his] niece" and was "the driver."

Mark Chambers testified that he arrived at the party at 2706 Northmeade Avenue just as it was starting to get dark. He drove his nephew, Lemarcus Moore, and another person to the party in his burgundy Buick Roadmaster. Mark stated that he was sitting under the carport eating when he first heard the gunshots. Several people ran by him yelling, "They shooting, they shooting." Mark saw sparks as the bullets hit the bricks on the home. He ran to the backyard with everyone until someone told him that Lemarcus Moore had been shot. He looked for Moore in the front yard, and when he saw sparks from the bullets hitting the side of the house, he returned fire with his own guns, a 9 millimeter Smith and Wesson and a 9 millimeter Ruger, for which he carried a permit. Mark did not remember how many times he fired his guns but asserted that he was still being fired upon at the time he fired at them. He explained that he had his guns with him that night because he carried them with him wherever he went. He said he was "scared" when the gunshots started and that he could not see who was firing from the top of the hill because it was dark. He finally saw Moore when he "circled around the house . . . and came back up under the car[port]." Mark and Cleotha Norwood picked up Moore, who was bleeding, and put him in his car as the shooting continued, and his brother Steve Chambers drove them to the hospital. Mark said that nearly everyone else at the party had run into the house by the time they carried Moore to the car. He recalled that the shooting went on for "fifteen, twenty minutes." Mark said he was not at the party when the fistfight between Robrecus Braxton and Kenneth Brown, Devon Brown, and Richardson occurred.

Steve Chambers, who was friends with Robrecus Braxton and Christopher Braxton, arrived at the party at the Northmeade house around 6:00 or 7:00 p.m. on July 3, 2010. He recalled seeing his brother, Mark Chambers, at the party as well as Lamarcus Moore, Robrecus Braxton, Christopher Braxton, and Felix Williams. Just before midnight, Steve was standing under the carport of the Northmeade house with several other people when he heard shots fired. When the bullets began hitting the cars in front of them, everyone "ran to the backyard." Steve could not see who was shooting but could tell that the gunshots were coming from a house across the street that was on a hill. He heard someone say that Kimberly Jamerson had been shot, and he walked back to the carport as Moore came out of the side door to the house and "just fell face first." When he saw that Moore's entire pant leg was "full of blood[,]" he realized that Moore also had been shot. At that point, Steve,

Mark, and Cleotha Norwood grabbed Moore and ran to the car as the shooting continued. On the way, Steve picked up a gun that Mark had dropped and fired about three times in the direction of the shooters so that they could make it to the car. Steve said that he heard over fifty gunshots, that the shooting lasted "[a] good five, ten minutes," and that he was afraid. He said he never saw who was firing the shots because it was dark at the time. Steve said he was not present during the fistfight earlier that day.

Lamarcus Moore testified that he attended the party at the Northmeade house with his uncles, Mark and Steve Chambers. He heard people talking about a fistfight that had occurred before they got to the party. When a car drove by, he heard someone say, "That's them, that's them[.]" Later, Moore was standing on the street behind a truck when he saw some fireworks aimed at the house and then saw "bullets flying" toward the house from the same direction. He could not tell who was firing the gunshots because it was dark outside. When Moore realized that he had been shot, he ran toward the backyard and then went inside the house. He began to feel dizzy, and when he saw that he was bleeding, he fainted near the door. When he regained consciousness, Mark and Steve Chambers said they were going to drive him to the hospital, and Cleotha Norwood carried him to the car as the shooting continued. Moore said that he was "really terrified" when he realized that gunshots were being fired in his direction. Because he was shot in the main artery of his left leg, he underwent two surgeries which caused permanent scars, and the bullet remained in his leg.

Sonja Watkins, Felix Williams's wife and Robrecus Braxton's and Christopher Braxton's mother, testified that she was preparing food the afternoon of July 3, 2010 for the Fourth of July party the next day. In addition to her immediate family being present on July 3, 2010, she recalled that Nakia Greer, Steve Chambers, Mark Chambers, Bianca Nevels, Cleotha Norwood, DeAngelo Stallion, Travis Britton, Chymia Baker, Jalon Baker, Kenneth Baker, Davis Brooks, Whitney Henderson, Danera Love, and Danaria Love were also present. When Watkins heard about the fistfight in the front yard, she went outside to help break up the fight. Several hours later, she heard what she initially thought were fireworks but quickly realized were gunshots. She ran to the bedroom to get the children to a safe place and saw that "one of the boys" had been shot in the leg. She later went outside and saw her niece, Kimberly Jamerson, dying from a gunshot wound. Sonja said that the shooting "seemed like it went on forever" and when it finally stopped, she saw bullet holes throughout the living room of her home, causing drywall dust and shattered glass from the broken windows to be scattered around the room. She also said that there were bullet holes in the cars parked around the house and that bullets had "knocked bricks off the walls [of her home]."

Inga Yancy testified that she lived in the house at 3840 Helmwood Street, which was located at the corner of Helmwood Street and Northmeade Avenue. Between midnight and

12:30 a.m. on July 4, 2010, Yancey said she was awakened by what she thought were fireworks. She checked on her dog at the side door and went back to bed. A short time later, the police knocked on her door and informed her that there had been a shooting. Yancey stated that it took her approximately two minutes to get up, check on her dog, and return to her bed and that the noises that she thought were fireworks continued during the entirety of that time period. However, she admitted that she did not know how long the noises had been occurring before she was awakened. When the police arrived at her house, Yancy looked outside and saw a large amount of crime scene tape in her front yard.

Demar Wells, a crime scene investigator with the Memphis Police Department, testified that he investigated the two crime scenes in this case. He photographed and collected evidence from 3840 Helmwood Street and at 2706 Northmeade Avenue, where Kimberly Jamerson was killed. Investigator Wells found "a large amount of spent [shell] casings" in the front yard of the house at 3840 Helmwood Street and in the area surrounding the house. He collected numerous spent shell casings from the 3840 Helmwood Street address, including thirty-two .30 carbine casings, eight .45 caliber casings, twenty-five LC-05 casings, and three .20 gauge shot gun shell casings. Investigator Wells and Sergeant Marlon Wright walked down to 2706 Northmeade Avenue and saw several cars with "possible bullet holes in them." He also saw what appeared to be blood at 2706 Northmeade Avenue where Kimberly Jamerson's body had been lying and what appeared to be blood inside the home at 2706 Northmeade Avenue. He observed damage to the Northmeade home from bullets. In addition, Investigator Wells found the following spent casings in the front yard at 2706 Northmeade Avenue: six 7.62 X 39 casings in the grass just east of where Jamerson's body was lying and nine 9 millimeter casings near the east side of 2706 Northmeade Avenue at the driveway. He stated that the 7.62 X 39 casings were shots from AK-47 or a MAC-90 automatic assault rifle and that the location of these casings meant that someone at the Northmeade location was shooting an automatic assault rifle. He also collected a bullet fragment under a Dodge Durango that was parked in the driveway and another bullet fragment on a window ledge inside the home. Investigator Wells noted that in his ten years with the crime scene investigation unit, this was the largest crime scene involving gunshots that he had ever investigated. Based on the evidence he had seen, he concluded that the shots fired at 2706 Northmeade Avenue came from the east. He noted that the house at 3840 Helmwood Street was three or four houses east of the house at 2706 Northmeade Avenue.

Marlon Wright, a sergeant and a crime scene investigator with the Memphis Police Department, testified that he collected evidence from the two crime scenes at the Northmeade and Helmwood locations for ten to eleven hours because the crime scenes were so extensive. Sergeant Wright stated that the Mobile Command Unit was called because the crime scene was spread over such a wide area that the officers needed additional light to process the scene. At the 3840 Helmwood Street address, he found "numerous spent casings" in the

flower bed, along the wall of the house, along the sidewalk, and in the grass. He said that the house at 3840 Helmwood Street was located on a hill above the house at 2706 Northmeade Avenue. When he stood at the house at 3840 Helmwood Street, he was able to "see everything down the hill" to the Northmeade house. However, visibility from the Northmeade house to the Helmwood house was "limited at best" because of the sharp incline. Sergeant Wright said he and the other officers took photographs of the spent casings, took measurements for the diagrams, and collected evidence from both crime scenes. He prepared several diagrams showing where each of the shell casings were found at the Northmeade and Helmwood locations and where the Northmeade house and cars near the Northmeade house were struck by bullets. Specifically, he saw "four bullet holes in the actual house located at 2706 [Northmeade Avenue] as well as four bullet holes in a vehicle parked in the driveway at 2706 [Northmeade Avenue]." In addition, there was a bullet hole in the left taillight of a vehicle parked in the driveway. Based on Sergeant Wright's measurements, the distance from a tree in front of the Helmwood house to the location where Kimberly Jamerson's body was found was 233 feet and 10 inches while the distance from the tree at the Helmwood house to the driveway of 2706 Northmeade Avenue was 294 feet and 1 inch.

Kevin Lundy, a sergeant with the homicide bureau of the Memphis Police Department, testified that he initially responded to the Northmeade crime scene but left that location to recover a Smith and Wesson silver and black 9 millimeter handgun and a 9 millimeter Ruger handgun that were found inside a burgundy Buick Roadmaster belonging to Steve and Mark Chambers that had been towed to the Memphis Police Department's crime scene tunnel. He photographed and collected the Smith and Wesson pistol from under the front passenger seat of the Buick Roadmaster and the 9 millimeter Ruger pistol from the trunk of the vehicle.

William Merritt, a sergeant and case coordinator for the homicide bureau of the Memphis Police Department, testified that he investigated the case involving the death of Kimberly Jamerson. Sergeant Merritt stated that although the shell casings found at the Helmwood address were dusted for fingerprints, no fingerprints were found on any of the casings.

Sergeant Merritt interviewed Richardson on the afternoon of July 4, 2010. After advising Richardson of his Miranda rights through an Advice of Rights form, Richardson waived his right to remain silent and his right to have an attorney present before answering questions about the incident. Richardson told Sergeant Merritt that he had driven to 2706 Northmeade Avenue with another person, and there had been a dispute over the amount of marijuana. He said that when they returned to the Northmeade address, they got into a fistfight with some individuals at the party there. Richardson claimed that after the fight, he left the scene and went to a female friend's house, where he stayed for a while, and he

asserted that he was not present at the time of the shooting. When Sergeant Merritt asked him for the name of this female friend, Richardson changed his story and stated that although he was going to go to his friend's house, he went to his mother's house instead. When Sergeant Merritt informed Richardson that he would have to talk to his mother to verify that he was with her at the time of the shooting, Richardson finally acknowledged that he had played a role in the shooting incident. Richardson then admitted that he had been armed with a revolver and that he had fired six shots in the air.

Following this admission, Sergeant Merritt and a transcriptionist prepared a written statement, which Richardson read and signed after making some corrections. Richardson's statement said that after the fistfight, he went to Kenneth Brown's and Devon Brown's house on Cracklerose Drive. He said that Kenneth "was talking about they was going to go and do something and so when they got strapped up, we went around there and parked around the corner." He said Kenneth Brown drove him and Devon Brown in Kenneth's blue Chevrolet Lumina to the Helmwood location, which was on the corner on a hill just up the street from 2706 Northmeade Avenue. They "hopped out, walked to the corner, and started shooting." Richardson admitted that he was present when Kimberly Jamerson was shot. He also admitted that he was armed with a revolver and that he had fired his gun six times in the direction of the people at 2706 Northmeade Avenue, but he claimed he "was pointing [his gun] up above them." Richardson said Kenneth and Devon Brown were firing shots during the incident, although he did not know what weapons they were firing and did not know where they had gotten the weapons. After firing the gunshots, they ran back to the car, and Kenneth dropped Richardson off on Coral Street. He then walked around the corner to his home. Richardson said that he left his weapon in the Lumina after the shooting. He claimed that it was not his idea to shoot at the house on Northmeade but that he "just went along with it." Richardson asserted that he "didn't plan on hurting nobody" and "was just going to shoot up in the air."

Sergeant Merritt stated that no firearms were recovered from Richardson, Kenneth Brown, or Devon Brown. He also said that no weapons were found at the Browns' house on Cracklerose or in the blue Chevrolet Lumina. Sergeant Merritt identified a photograph showing that Kenneth Brown had a black eye, an abrasion on his nose, an injury to his right knee, and an scrape on his right shoulder at the time of his interview, which was a short time after the incident. He said that Kenneth's Chevrolet Lumina was found at the home of someone related to the Browns and that when it was recovered, the back window was broken, but no bullets were found inside the vehicle. Sergeant Merritt stated that Richardson was cooperative and remorseful at the time he gave his statement. He also said that Richardson did not have a black eye when he was interviewed.

Dr. James Lewis Caruso, an expert in the field of forensic pathology, testified that he performed the autopsy on Kimberly Jamerson. He stated that Jamerson suffered a gunshot wound to the head as well as abrasions to her forehead, the bridge of her nose, and the tip of her nose. She also had a laceration near her mouth. Dr. Caruso said that the bullet entered and exited her head, causing "significant injury to her brain[.]" He explained that the bullet entered the front of Jamerson's head and exited at the back right of her head with very little deviation up or down and that the entrance wound and the exit wound were both around one inch from the top of Jamerson's head. During the autopsy, Dr. Caruso recovered several bullet fragments and pieces of the bullet jacket from Jamerson's head, which he gave to police. Dr. Caruso opined that Jamerson's cause of death was a gunshot wound to the head and that the manner of death was homicide.

Steve Scott, a special agent forensic scientist with the Tennessee Bureau of Investigation, was declared an expert in the field of firearms identification. He testified that he examined and tested the ballistics evidence collected in this case. Agent Scott opined that the six 9 millimeter cartridge cases found in the front yard of the home at 2706 Northmeade Avenue were fired from the Smith and Wesson 9 millimeter semi-automatic pistol recovered from Mark Chambers's vehicle. He also opined that the three 9 millimeter cartridge cases found in the front yard of the home at 2706 Northmeade Avenue were fired from the Ruger 9 millimeter pistol recovered from that same vehicle. In addition, he determined that the six 7.62 X 39 millimeter rifle cartridge cases that were found at the Northmeade location had all been fired from the same rifle, either an AK-47 or Chinese SKS. After examining the whole .30 caliber bullet found at the Northmeade address, Agent Scott determined that the bullet fragments recovered from Kimberly Jamerson's head matched this .30 caliber bullet and were consistent with having been fired from the same weapon, a .30 carbine caliber rifle. He also concluded that a different whole bullet and a bullet fragment collected from the Northmeade location were from the .22 caliber class and were most consistent with being fired from a 223 Remington caliber firearm.

Agent Scott also examined the casings found at the Helmwood address and concluded the following: the three .20 gauge shot shell cases had been fired from the same .20 gauge shotgun, the eight .45 caliber automatic cartridge cases had been fired from the same .45 caliber automatic pistol, the twenty-five LC-05 or 223 Remington caliber cartridge cases had characteristics indicating that they had been fired from the same "military assault-type rifle," even though he could not conclusively match them with one another, and the thirty-two .30 carbine caliber cartridge cases had been fired from the same .30 carbine military-style rifle. In addition, Agent Scott stated that although there was no way to determine whether a fired bullet came from a cartridge case, the 223 bullet and bullet fragment that were collected from the Northmeade location were of the same type and design as would come from the cartridge cases collected from the Helmwood location. Additionally, he stated that the .30 caliber

carbine cases found at the Helmwood location were the same type and caliber as the bullet fragments recovered from Kimberly Jamerson's brain and as the .30 carbine caliber bullet from the Northmeade location. He stated that he was not given any evidence having to do with a revolver, although cartridge cases have to be manually removed from a revolver and are not ejected. Agent Scott determined that four firearms had been fired from the Helmwood location, although he acknowledged that a person or persons could have been firing more than one firearm. He also noted that the .30 carbine rifle, the 223 Remington rifle, and the .20 gauge shotgun were "long-range firearms" and that while the .45 caliber automatic pistol would "certainly travel as far from the Helmwood location down to the Northmeade location, [it was] not as accurate . . . at . . . striking the target [from a long distance away]." Agent Scott acknowledged that Felix Williams tested positive for gunshot residue, which indicated that Williams "could have fired, handled, or [been] near a gun when it fired." He also stated that "any firearm that's mounted with a laser si[ght] could project a green or red light" and that these sights could be placed on any of the aforementioned rifles or the .45 automatic pistol, although he would not expect to see a laser sight on a .20 gauge shotgun.

## ANALYSIS

**I. Supplemental Jury Instruction.** Richardson argues that the trial court's supplemental instruction in response to two questions from a juror after the close of the State's proof invaded the province of the jury and improperly commented on the evidence, thereby violating Article IV, Section 9 of the Tennessee Constitution. As we will explain, the juror's questions concerned the direction Kimberly Jamerson's body was lying at the time of her death and whether the house at 2706 Northmeade Avenue was searched for weapons. Richardson claims that both of the juror's questions focused on whether the victim was killed from the defendants' bullets from the Helmwood location or "friendly fire" from individuals at the Northmeade location, which were questions not answered by the proof, and that the trial court's response effectively told the jury to disregard these questions. He asserts that the trial court's response improperly commented on the evidence by suggesting the factual conclusions to be drawn from the proof. He also asserts the court's response invaded the province of the jury by precluding the jury from weighing the evidence, determining the inferences that could be drawn from the evidence, and reconciling any conflicts in the proof. We conclude that the trial court's response to these two questions was not prejudicially erroneous.

Here, prior to the beginning of trial, the trial court gave the jury the following instruction regarding the proper procedure for submitting questions about a witness's testimony at trial:

-12-

If you have a question about the testimony of a witness, write it down and present it to a Court deputy. Your question shall be anonymous. The deputy will then present the question to me. After discussion with the attorneys, if necessary, I will decide whether to ask the witness all or part of your question. For legal reasons, I might decide not to ask a witness a juror's question or ask only part of the question. Please do not be offended should this happen. The law is complex and contains many technical rules that the lawyers and I must follow. Please do not hold my decisions against any party in this case.

After the State rested its case-in-chief but before the defense rested its case, the trial court gave the following instruction to the jury: "You can't discuss the case amongst yourselves, you can't discuss it with anyone else, and I ask you to retire to your jury room for a few minutes, and we'll resume." Once the jury left the courtroom, the defense made its motion for judgment of acquittal, which the court denied. The court then informed the parties, outside the presence of the jury, that an anonymous juror had just submitted the following two questions:

(1) At 2706 [North]mead[e] there was a cas[]ing [7.62 X 39] in the Driveway at what point was the House searched for we[a]pons[?]

(2) Before the Body was moved were photos Taken? Was the Body laying [sic] in the Direction of 2706 [North]mead[e] or was it laying [sic] in the Direction of He[l]mwood?

Because the State had rested its case-in-chief and the defense had indicated that it would not present any proof, the trial court stated that it was going to "refer the jury to the preliminary instructions . . . and tell them that they will receive all the evidence . . . and . . . that if those questions were answered by the proof, that they may consider the questions and the answers, and if they were not answered by the proof, that they cannot speculate, cannot guess at what the answer might have . . . been if it was not, in fact, answered by the proof." Although the defense did not initially object to the trial court's proposed response, it moved for a mistrial at short time later on the basis that the submitted questions indicated "the jurors [were] already deliberating." The trial court noted that because the State had rested, there was no way that the questions could be answered. It then determined that there was nothing to indicate that the jury had started deliberating and that it believed the jury had simply "followed the court's instruction [about] put[ting] any questions [it had] in writing." The court then denied the motion for a mistrial on the basis that it had instructed the jury it could not deliberate or discuss the case until the case had been concluded, the jury had heard all of

the court's law and counsels' arguments, and the two alternates had been excused from the jury. The court noted that the jury was presumed to have followed its instructions.

After the jury returned to the courtroom and the defense announced that it would not be presenting any proof, the trial court informed the jury that it had heard all of the proof that would be presented in this case. It then informed the jury about the anonymous juror's questions:

> Ladies and gentlemen, you have heard all the proof that you will hear. Now, I have a question from one of the members of your jury, and it's actually a two-part question, that says, "At 2706 Northmeade, there was a casing, a 7.2 36 x 9 in the driveway. At what point was the house searched for weapons?" The second part of the question: "Before the body was moved, were photos taken? Was the body lying in the direction of 2706 Northmeade or was it lying in the direction of Helmwood?"

> Ladies and gentlemen, I'm going to have to refer you back to the instructions I gave you before trial, the preliminary instructions on page 6, the second to the last paragraph, that, "During the trial, you will receive all of the evidence you may properly consider to decide the case."

> And I can't answer that question for you, both sides having rested.

> If that question was answered by the proof, you may consider the question, you may consider the answer to the question. If it was not answered by the proof, you cannot consider that question, you cannot speculate or guess what the answer might have been if it was not, in fact, answered by the proof; does everyone understand that?

During a bench conference out of the hearing of the jury, the defense objected to the trial court's response to the two questions, asserting that the court's response precluded the jury from "consider[ing] what's not in the evidence as proof, that an element hasn't been proven." The trial court overruled the objection on the basis that the information the juror sought did not pertain to the elements of the offenses and that although the juror might want the answers to these questions regarding the direction of the body and whether the house was searched for weapons, the jury could not consider those facts "because it would be allowing [it] to guess or speculate on factual issues." The court then stated:

-14-

[The State has] to prove the elements of the case beyond a reasonable doubt; they don't want to prove all the facts or all the facts that a jury may be interested in.

Now, the curiosity as to the questions that were asked, those are not elements and those are not something that the State would have to prove.

You may certainly argue anything that you choose to argue that's raised or not raised by the facts or the inferences . . . from the facts. . . . But the instructions are that the State has to prove the elements beyond a reasonable doubt, and you may certainly argue what the State didn't prove, and the State will probably argue they didn't have to prove it[.]

Richardson argues that the trial court's response to the juror's questions violated Article VI, Section 9 of the Tennessee Constitution, which provides, "Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." The jury must decide the facts of the case under the supervision of the judge, and the judge must provide the law governing the parties without interfering in finding the facts. Kanbi v. Sousa, 26 S.W.3d 495, 498 (Tenn. Ct. App. 2000) (McBride v. Allen, 720 S.W.2d 459, 463 (Tenn. Ct. App. 1979)). A trial court must be "very careful not to give the jury any impression as to [its] feelings" or "make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989). "[I]in order to protect the jury's fact-finding role, judges must be very careful about expressing or intimating any opinion on any fact at issue." Kanbi, 26 S.W.3d at 498-99 (citing Graham v. McReynolds, 18 S.W. 272, 277 (1891)).

We note that trial courts have "the authority to respond to jury questions with a supplemental instruction." State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995) (citing State v. Moore, 751 S.W.2d 464, 467 (Tenn. Crim. App. 1988)). The "appropriate course of action" for the trial court in responding to a question from the jury is "to bring the jurors back into open court [and] read the supplemental instruction . . . along with a supplemental instruction emphasizing that the jury should not place undue emphasis on the supplemental instructions . . . ." State v. Bowers, 77 S.W.3d 776, 791 (Tenn. Crim. App. 2001). The failure to follow the proper procedure is subject to harmless error analysis and reversal is not required if the defendant has not been prejudiced. State v. Tune, 872 S.W.2d 922, 929 (Tenn. Crim. App. 1993). When a trial court repeats instructions or gives supplemental instructions, the instructions must be:

(1) appropriately indicated by questions or statements from jurors, or from the circumstances surrounding the deliberative and decisional process, (2)

comprehensively fair to all parties, and (3) not unduly emphatic upon certain portions of the law to the exclusion of other parts equally applicable to the area of jury misunderstanding or confusion.

Berry v. Conover, 673 S.W.2d 541, 545 (Tenn. Ct. App. 1984).

When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994); Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)); see State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing Forbes, 918 S.W.2d at 447; Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977)). Because a question regarding the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

We conclude that the trial court's supplemental instruction in response to the juror's two questions was not prejudicially erroneous. The trial court's response merely restated a portion of the preliminary jury instructions, which explained that the jury will receive all the evidence that it may properly consider to decide the case. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 1.00 Preliminary Jury Instructions. The response did not comment on particular pieces of evidence or testimony presented at trial, did not indicate that the answers to these two questions were not in the evidence presented at trial, did not show any partiality or bias toward either party, and did not make any statement regarding the weight or credibility of the evidence. While the trial court's supplemental instruction should have admonished the jury not to place undue emphasis upon the supplemental instruction, the final jury instructions informed the jury that "[t]he order in which these instructions are given is no indication of their relative importance" and that it "should not single out any one or more of them to the exclusion of another or others but should consider each instruction in light of and in harmony with all the others." See Forbes, 918 S.W.2d at 452 (citing State v. Chance, 778 S.W.2d 457, 462 (Tenn. Crim. App. 1989)); see Burton v. State, 394 S.W.2d 873, 876-77 (Tenn. 1965).

Despite Richardson's claims to the contrary, the record does not show that the trial court's response to these two questions prevented the jury from considering whether the victim was inadvertently killed by "friendly fire" from the Northmeade house rather than by gunfire from Richardson and his co-defendants. Instead, the court's response instructed the jury that it was not allowed to speculate about the answer to the juror's questions if there was no evidence presented at trial that provided the answer to those questions. Although Richardson claims that the trial court's response prevented the jury from considering whether an element of the offense had not been proven, the preliminary jury instructions and the final instructions repeatedly emphasized to the jury that the State had the burden of proving each element of the offenses beyond a reasonable doubt. In light of all the instructions given in this case, we agree with the State that the jury was not precluded from considering any choice that the evidence supported, including the possibility that the State failed to prove Richardson's guilt of the offenses beyond a reasonable doubt. Consequently, we conclude that the court's response to these two questions neither invaded the province of the jury nor improperly commented on the evidence. Moreover, we conclude that the jury charge, as a whole, did not fail to fairly submit the legal issues and did not mislead the jury as to the applicable law.

**II. Comments to Jury Venire.** Richardson contends that the trial court committed plain error when it informed the jury venire that the State was not seeking the death penalty or a sentence of life imprisonment without parole if the jury convicted him of first degree premeditated murder. He claims that the court's comments violated Tennessee Code Annotated section 40-35-201(b) and "misled the venire" because the sentence he actually received, life imprisonment plus 224 years, amounted to a sentence of life imprisonment without the possibility of parole. He also claims that the court's erroneous instruction minimized the seriousness of the dozens of charges against him and "contributed to a lack of serious deliberation" by the jury. We conclude that these comments were not error, much less plain error.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

-17-

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (citations omitted) (internal quotations marks omitted). Moreover, "[i]t is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

Richardson claims that the court's comments violated Tennessee Code Annotated section 40-35-201(b), which provides:

> In all contested criminal cases, except for capital crimes that are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Tennessee Constitution, article VI, § 14 and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.

In short, this code section states that in non-capital cases the trial court may not instruct the jury on the possible penalties for the charged offense or any lesser included offenses. A 1999 Attorney General Opinion outlined the proper jury instruction in a situation where the State has not sought the death penalty or imprisonment for life without the possibility of parole:

> In a first degree murder case, where the State has not filed notice of intent to seek the death penalty or imprisonment for life without possibility of parole, Tenn. Code Ann. §40-35-201(b) precludes instructing the jury as to possible penalties for the crime charged. The trial court should inform the jury that upon a conviction for first degree murder, the trial court will impose the appropriate sentence as provided by the law.
>
> . . . .
>
> . . . [W]hen a case proceeds under § 39-13-208(c), it is impermissible for a trial court to inform the jury that first degree murder carries a potential penalty of either the death penalty, imprisonment for life without possibility of parole, or life imprisonment. . . .

Tenn. Op. Atty. Gen. No. 99-178, 1999 WL 1012852 (Tenn. A.G. Sept. 17, 1999).

This court has consistently held that it is harmless error for a trial court to instruct the venire or the jury that the State is not seeking the death penalty or a sentence of life imprisonment without parole and that if the defendant is convicted of first degree murder, he will receive an automatic sentence of life imprisonment. See State v. Ramone Lawson, No. W2013-00324-CCA-R3-CD, 2014 WL 1153268, at *6 (Tenn. Crim. App. Mar. 19, 2014), perm. app. denied (Tenn. Aug. 26, 2014); State v. Derek Willamson, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *6 (Tenn. Crim. App. Aug. 12, 2011); State v. Charles Ray Allen, No. M1999-00818-CCA-R3-CD, 2000 WL 1649507, at *8 (Tenn. Crim. App. Nov. 3, 2000).

However, in this case, the trial court did not inform the venire that Richardson would receive an automatic life sentence if the jury convicted him of first degree murder. Instead, the court merely commented that the State was not requesting the death penalty or a sentence of life imprisonment without parole and that it would impose the appropriate sentence if Richardson were convicted of first degree premeditated murder. Specifically, the court made the following statement to the jury venire:

> This is a case, I told you that Mr. Richardson has two indictments. One indictment charges him with murder in the first degree. And a lot of times, when people hear that term, murder in the first degree, jurors start wondering, "Is this a death penalty case, because, Judge, I can't sit on a death penalty case." This is not a case where the State of Tennessee has filed any notice asking for any enhanced punishment on this case. If . . . Mr. Richardson is found guilty of first-degree murder, I'll sentence him for that and I'll sentence him on anything else that the jury finds him guilty of, if he's found guilty of anything. So it is not a case where the State is asking for the death penalty [], it's not a case where the State is asking for life imprisonment without the possibility of parole. For those jurors that [were] thinking, "I wonder if we have to make a decision as to whether or not Mr. Richardson would be sentenced to life without parole or sentenced to the death penalty," those punishments are not options in this case because the State is not seeking that enhanced punishment; does everyone understand that?

The court made no further comments about Richardson's potential sentence.

In State v. Billy Gene Debow, No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *7 (Tenn. Crim. App. Aug. 2, 2000), a case most similar to the instant case, the trial court informed the venire, over the defendant's objection that the case was not a death penalty case

after two potential jurors indicated their hesitation about sitting on the case because they believed a possible penalty was death. This court held the court's comment in Debow was not error:

> [Code section 40-35-201(b)] provides that the judge and attorneys may not comment on possible penalties. Because this was not a capital case, the death penalty was not a possible penalty. Thus, by instructing the jury that the death penalty was not an option, the trial judge was not violating the language of the statute.

Id. at *8. The court explained the reasoning behind its holding:

> Although most potential jurors do not understand the intricacies of the death penalty statutes, they are aware that the death penalty is a possible penalty in Tennessee for first degree murder. Without being informed otherwise, jurors on a first degree murder case might very well believe that death could be imposed as a result of their verdict, even when the state is not seeking the death penalty. Thus, jurors on such a first degree murder case might be more inclined to find the defendant guilty of a lesser included offense if they do not believe that the defendant's conduct warranted death. By prohibiting the courts from informing Juries that death is not an option, the legislature would in essence be creating the same problem that it had before: Juries might decide the cases based on the potential punishment rather than the defendant's guilt or innocence of the crime charged. We do not believe that this was the intent of the legislature. Accordingly, we conclude that the statute relied upon by the Defendant does not prohibit a trial judge from informing the jury in a non-capital case that the death penalty is not a punishment option.

Id. In light of the decision in Debow, we conclude that the statute does not prevent a trial court from informing the jury in a non-capital case that the State is not seeking the death penalty or a sentence of life imprisonment without parole. In reaching this decision, we agree with the Debow court that juries must decide cases based on the defendant's guilt or innocence of the charged offense rather than any possible punishment the defendant might face. Because the trial court's comments in this case made no mention of Richardson's possible penalties if convicted, the comments were not error, and Richardson is not entitled to plain error relief. See id. at *8; Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42).

Richardson also contends that the trial court misled the jury by indicating that life without parole was not a sentencing option when he ultimately received a sentence of life

-20-

imprisonment plus 224 years. Initially, we note that Richardson was not sentenced to life imprisonment without parole for his first degree murder conviction. Sentences of life imprisonment without the possibility of parole are only imposed on first degree murder convictions and are imposed by a jury in a separate hearing after the State gives appropriate notice to the defendant. See T.C.A. § 39-13-207(a), -208(b). The trial court's comments were directed to the first degree murder charge and never mentioned the sentences Richardson might serve if he were found guilty of any of the other charges, as was proper.

We also conclude that Richardson's reliance on State v. Cook, 816 S.W.2d 322 (Tenn. 1991), and Dean v. State, 59 S.W.3d 663 (Tenn. 2001) is misplaced. Both Cook and Dean concerned a trial court's error regarding a prior version of Code section 40-35-201(b) (1997) (repealed 1998), which stated that upon the motion of either party, the trial court was required to instruct the jury on the possible penalties for each of the defendant's charges and all lesser included offenses. This prior version of the statute was repealed in 1998 and the new version of the statute, which is applicable to Richardson's case, precludes a trial court from instructing the jury on the possible penalties in a non-capital case. Despite this, Richardson maintains that Dean and Cook still entitle him to relief. He claims that in those cases, just as in his case, the defendants were prejudiced by the trial court's comments because they received a sentence that was greater than the range of punishment contemplated by the jury. See Dean, 59 S.W.3d at 669 (citing Cook, 816 S.W.2d at 327). Richardson asserts that even though the trial court informed the jury that he would not receive a sentence of life imprisonment without parole, he ultimately received "a sentence of life with consecutive time that remove[d] the possibility of parole." We conclude that Cook and Dean are inapplicable to Richardson's case for a variety of reasons, most notably because Richardson received a sentence of life imprisonment for his first degree murder conviction, which was not greater than the range of punishment contemplated by the jury on that charge. The fact that Richardson received other sentences for his other convictions that resulted in a lengthy sentence in addition to his sentence of life imprisonment does not entitle him to relief.

**III. Special Instruction.** Richardson argues that the trial court erred by given a special instruction to the jury that the credible testimony of one victim or witness is sufficient to support a conviction. He acknowledges that he did not make a contemporaneous objection to this instruction at trial and did not include this issue in his motion for new trial but asks this court to consider the issue under plain error review. We conclude that although the trial court's instruction was error, it was harmless beyond a reasonable doubt and does not constitute plain error.

Here, the trial court provided the following instruction on identification that was based on Tennessee Pattern Jury Instruction 42.05:

Identity. One of the issues in this case is the identification of the Defendant as the person who committed the crime. The State has the burden of proving identity beyond a reasonable doubt. Identification testimony is an expression of belief or impression by the witness, and its value may depend upon your consideration of several factors. Some of the factors which you may consider are:

(1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting and whether the person who committed the crime was a prior acquaintance of the witness;

(2) The degree of certainty expressed by the witness regarding the identification and the circumstances, under which it was made, including whether it is the product of the witness' own recollection;

(3) The occasions, if any, on which the witness failed to make an identification of the Defendant, or made an identification that was inconsistent with the identification at trial; and

(4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

Again, the State has the burden of proving every element of the crime charged, and this burden specifically includes the identity of the Defendant as the person who committed the crime for which he is on trial. If after considering the identification testimony in light of all the proof you have a reasonable doubt that the Defendant is the person who committed the crime, you must find the Defendant not guilty.

See T.P.I.–Crim. 42.05.

The trial court then added the following special instruction, to which Richardson now objects:

The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. The Court

charges you that the credible testimony of one victim or one witness, standing alone, is sufficient to support a conviction.

Then the court instructed the jury that it was only to convict Richardson if it determined that he committed the offenses in this case beyond a reasonable doubt:

The Court further charges you that if you are satisfied from the whole proof in the case, beyond a reasonable doubt, that the Defendant David Richardson committed the crimes charged against him, and you are satisfied beyond a reasonable doubt that he has been identified as the person who committed the crimes charged, then it would be your duty to convict him.

On the other hand, if you are not satisfied with the identity from the proof, or you have a reasonable doubt as to whether he has been identified from the whole body of the proof in the case, then you must return a verdict of not guilty.

Richardson asserts that the challenged special instruction "polluted the reasonable doubt standard" by including the "appellate standard of review for sufficiency of the evidence challenges." He claims that because the court's initially instructed that "[t]he State has the burden of proving identity beyond a reasonable doubt" and then provided the special instruction that this standard is satisfied with the credible testimony of one witness, the jury could have logically inferred that "proof beyond a reasonable doubt is satisfied with one witness." He asserts that this non-structural constitutional error was not harmless beyond a reasonable doubt, especially given that Agent Scott's testimony established some of the essential elements of the charged crimes. He claims Agent Scott was the sole witness to connect him to the offenses because he concluded that the bullet fragments removed from Jamerson's head and the whole bullet retrieved from the crime scene were fired from the same gun and were "most consistent" with a .30 carbine caliber bullet whose casings had been found at the Helmwood location, where Richardson admitting to firing a gun.

Richardson claims the court's special instruction was particularly damaging regarding the attempted first degree murder convictions and the aggravated assault convictions because it allowed the jury to convict him of these offenses based on "the credible testimony of one victim or one witness[.]" He also claims that if the jury was unsure about whether the State established the fear element for the aggravated assault counts in which the victims named in those counts did not testify, then the special instruction erroneously resolved this issue for them by telling them that the credible testimony of one victim or one witness was sufficient to support a conviction. Finally, Richardson asserts that the special instruction prejudiced

-23-

the judicial process because it told the jury that one witness was enough to disregard the defense's theory of mere recklessness and to convict on the charged offenses.

The State concedes that the court's special instruction was erroneous based on State v. David Michael Chubb, No. M2005-01214-CCA-R3-CD, 2007 WL 258429 (Tenn. Crim. App. Jan. 29, 2007), but asserts that the error was harmless beyond a reasonable doubt because the proof of the defendant's identification was largely circumstantial and did not depend on the testimony of a single witness. In David Michael Chubb, the defendant was convicted of four counts of aggravated sexual battery, one count of attempted aggravated sexual battery, one count of possession of marijuana, and one count of possession of drug paraphernalia. Id. at *1. Most of the proof regarding the sexual battery offenses came from the testimony from the victim and the defendant, and the jury was required to make credibility determinations regarding this evidence. Id. at *2-4, *7-8, *16. Over the defendant's objection, the trial court granted the State's request to give the following instruction to the jury because it believed it was a correct statement of the law: "[I]n a sexual abuse case you may convict the defendant on the basis of the victim's testimony alone. Corroboration of the victim's testimony is not necessary." Id. at *16. The court gave the aforementioned instruction based on Tennessee Code Annotated section 40-17-121, which provides:

> If the alleged victim of a sexual penetration or sexual contact within the meaning of § 39-13-501 is less than thirteen (13) years of age, such victim shall, regardless of consent, not be considered to be an accomplice to such sexual penetration or sexual contact, and no corroboration of such alleged victim's testimony shall be required to secure a conviction if corroboration is necessary solely because the alleged victim consented.

On direct appeal, this court reversed the defendant's convictions for aggravated sexual battery and attempted aggravated sexual battery on the basis that special instruction could have misled the jury:

> We agree with the appellant that the instruction should not have been given. In the context of addressing whether the evidence is sufficient to support the conviction, the testimony of the victim alone could be sufficient. However, the use of the disputed language in the context of instructing the jury regarding the State's burden of proof runs a serious risk of misleading the jury. Moreover, in Tennessee judges are prohibited from commenting on the credibility of witnesses or on the sufficiency of the evidence. Tenn. Const. [a]rt. VI, § 9; State v. Suttles, 767 S.W.2d 403, 406-07 (Tenn. 1989). The proof in this case essentially presented to the jury a question of credibility

-24-

between the victim and the appellant. The jury instruction effectively informed the jury that they need look no further than the victim's testimony to convict and thus implied that the jury need not consider all other proof. Accordingly, we conclude that the error merits reversal of the appellant's aggravated sexual battery and attempted aggravated sexual battery convictions. However, we conclude that the instruction had no impact on the appellant's drug related convictions.

Id. at *16.

In Richardson's case, the language in the special instruction was developed to assist appellate courts in determining whether eyewitness evidence was sufficient to establish the defendant's identity as the perpetrator beyond a reasonable doubt. See State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999); State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993). "The identity of the perpetrator is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). Because the challenged special instruction is best categorized as a misstatement of an element of an offense, it is a non-structural constitutional error subject to constitutional harmless error analysis. See State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008); Faulkner, 154 S.W.3d at 60; State v. Hollis, 342 S.W.3d 43, 51-52 (Tenn. Crim. App. 2011); State v. Paul Wallace Dinwiddie, Jr., No. E2009-01752-CCA-R3-CD, 2010 WL 2889098, at *10-11 (Tenn. Crim. App. July 23, 2010); see also Hedgpeth v. Pulido, 555 U.S. 57, 60-61 (2008). Such errors require reversal unless the error is deemed "harmless beyond a reasonable doubt." Rodriguez, 254 S.W.3d at 371 (citing Rice, 184 S.W.3d at 670; State v. Powers, 101 S.W.3d 282, 397 (Tenn. 2003)); Chapman v. California, 386 U.S. 18, 24 (1967). Consequently, the proper inquiry is not whether a guilty verdict surely would have been rendered in a trial without the error but "'whether the guilty verdict actually rendered in this trial was surely unattributable to error.'" Hollis, 342 S.W.3d at 52 (quoting Dinwiddie, 2010 WL 2889098, at *11).

We agree with the State that while this special instruction was error, it was harmless beyond a reasonable doubt because the proof identifying Richardson as the perpetrator did not depend on a single eyewitness's testimony. There were no eyewitnesses who saw Richardson committing the offenses in this case. Although Robrecus Braxton, Felix Williams, Mark Chambers, Steve Chambers, and Lemarcus Moore all testified that the shots were fired from a location up the street, none of these witnesses could identify who was shooting at them because it was dark outside and because the shooters were a long distance away. Instead, Richardson's identification as the perpetrator in the offenses was based on the following: his confession that he participated in the shooting, the circumstantial evidence of his motive and his proximity to the crime scene, and Agent Scott's ballistics testimony.

-25-

Although Agent Scott stated that the casings found at the Helmwood location were consistent with the bullets fragments found in Kimberly Jamerson's head and a whole bullet found at the Northmeade location, Agent Scott did not, as stated in the special instruction, "view[] the accused under such circumstances as would permit a positive identification to be made." When read as a part of the charge as a whole, it is clear that the challenged special instruction referred to eyewitness testimony, despite the fact that there were no eyewitnesses identifying Richardson as the shooter. Moreover, Agent Scott's testimony, which depended on the testimony from Dr. Caruso and the officers who collected the casings from the scene, was not enough to circumstantially connect Richardson to the crime without Richardson's confession that he shot a gun at the Helmwood location at the time of Jamerson's death. Because the proof did not align with the erroneous instruction on identification, we conclude that the error is harmless beyond a reasonable doubt. Accordingly, we conclude that Richardson is not entitled to plain error relief because he has failed to show that a substantial right of the accused was adversely affected and that consideration of the error is necessary to do substantial justice. See Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42).

**IV. Sufficiency of the Evidence.** Richardson argues that the evidence is insufficient to support his first degree premeditated murder conviction, his attempted premeditated murder convictions, and nine of his aggravated assault convictions. We conclude the evidence is sufficient to support these convictions.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing Majors, 318 S.W.3d at 857). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell,

245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." Dorantes, 331 S.W.3d at 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Rice, 184 S.W.3d at 662 (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275).

Here, the State argued that Richardson was guilty of the charged offenses under a theory of criminal responsibility. An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). In the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime can be inferred." State v. Watson, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." Id. (citing Ball, 973 S.W.2d at 293)). In order to be held criminally responsible for the acts of another, "there must be proof that the aider and abettor associated himself with the venture, acted with the knowledge that an offense was to be committed, and shared the principal's criminal intent." State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998) (citing Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). There is no requirement that the State "elect between prosecution as a principal actor and prosecution for criminal responsibility[.]" State v. Hodges, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998) (citing State v. Williams, 920 S.W.2d 247, 257-58 (Tenn. Crim. App. 1995)).

**A. First Degree Premeditated Murder Conviction.** Richardson argues the evidence was insufficient to show that he intentionally killed Kimberly Jamerson and claims that the proof established, at most, a reckless homicide pursuant to Tennessee Code Annotated section 39-13-215. To support the reckless homicide offense, he claims the proof showed that he and his co-defendants fired several shots toward the Northmeade house in the dark from a distance of three hundred feet away. He asserts that no evidence showed that he or the other defendants saw anyone at the Northmeade house, knew who was present at the time of the shooting, or intended to kill anyone at that address. Richardson asserts that the State never presented any proof contradicting his claim that he shot his gun in the air and never intended to shoot anyone.

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)). If the proof establishes that the defendant intended to cause the death of a person and that he acted with premeditation and deliberation, then the killing of another, even if it was not the intended victim, is sufficient to sustain a conviction for first degree premeditated murder. State v. Ely, 48 S.W.3d 710, 723-24 (Tenn. 2001); Millen v. State, 988 S.W.2d 164, 168 (Tenn. 1999).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include but are not limited to the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121

S.W.3d 600, 615 (Tenn. 2003); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted). As we previously noted, a defendant may be held criminally responsible for a first degree premeditated murder committed by another person if the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

The proof at trial showed that Kenneth Brown was involved in a dispute with Dena Watkins over a small amount of marijuana. After Felix Williams gave Kenneth Brown $5.00 to settle the dispute, Kenneth nearly hit Robrecus Braxton with his car as he was leaving the party, which ultimately led to a fistfight between Kenneth Brown, Richardson, and Devon Brown, and Robrecus Braxton, Christopher Braxton, and Kenneth Baker. After Richardson, Kenneth Brown, and Devon Brown lost the fight and were leaving the area, one of them said, "We'll be back." Richardson later told police that he and the other two men returned to the Browns' house, where they decided to exact revenge on the individuals attending the party. Then Richardson, Kenneth Brown, and Devon Brown "strapped up," returned to the area, and parked near 3840 Helmwood Street, where they "hopped out . . . and started shooting." Richardson admitted that he fired a revolver in the direction of the party at the Northmeade house. He also admitted that he was present when Kimberly Jamerson, who was unarmed and uninvolved in the previous dispute, was shot and killed. The bullet fragments removed from Jamerson's head were consistent with having been fired from a .30 caliber carbine rifle and matched the type and caliber of the thirty-two casings found at the 3840 Helmwood Street. Moreover, the physical evidence established that over sixty shots had been fired from four different weapons toward the Northmeade home where approximately twenty people were gathered for a Fourth of July party. The guns involved in this incident were never recovered.

Although Richardson acknowledges that he and his co-defendants killed Jamerson, he argues that the evidence is insufficient to show that he acted intentionally in causing her death. He claims that because he was shooting in the air and did not intend to kill anyone, his conviction should be reduced to reckless homicide. In response, we note that it was the jury's prerogative to reject Richardson's claim that he accidentally shot Jamerson and to accredit the State's theory that Richardson engaged in a premeditated plan to kill the people at the party and fired his shots at the house in furtherance of that plan. The evidence, at a minimum, showed that Richardson acted with the intent to promote or assist the commission of the first degree premeditated murder of Kimberly Jamerson by aiding Kenneth Brown or

Devon Brown to commit the offense. See id. § 39-11-402(2). Accordingly, we conclude that the evidence was sufficient to sustain his conviction for first degree premeditated murder.

**B. Attempted First Degree Murder Convictions.** Richardson also contends that the proof failed to show that he had the specific intent to kill any of the twelve victims named in the attempted first degree murder counts. Instead, he argues the evidence only established his guilt of the offense of reckless endangerment because his conduct placed or may have placed "another person in imminent danger of death or serious bodily injury." See id. § 39-13-103(a). Richardson notes that most of the victims in the attempted first degree murder counts did not testify. He asserts that although the evidence established that these victims were present at the time of the shooting, the proof did not establish where these victims were located on the property at the time of the shooting, what they were doing, or what reaction they had to the shooting. In addition, he claims that because he and his co-defendants shot toward the Northmeade house from approximately three hundred feet away, no rational juror could have convicted him of attempted first degree murder beyond a reasonable doubt based on this proof. Finally, he reiterates that no evidence established that he or his co-defendants saw anyone at the Northmeade house, knew who was present at the time of the shooting, or intended to kill anyone at that address.

As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b). As we have previously noted, first degree murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1).

The evidence presented at trial established that Richardson, Kenneth Brown, and Devon Brown grabbed at least four weapons, went to 3840 Helmwood Street, and fired more than sixty shots in the direction of the people at the party at 2706 Northmeade Avenue. Richardson admitted that he and his co-defendants were seeking revenge because they had lost the earlier fistfight at the Northmeade home. At the time of the shooting, Richardson knew that there were many people in attendance at the party. During this shooting incident, bullets entered the Northmeade home and damaged several cars parked near the house. Although Richardson claims that he merely shot his revolver in the air, it was the jury's prerogative to reject this claim. Affording the State the strongest view of the evidence, a rational jury could have found that Richardson intended to kill the victims named in these

counts by firing his gun in the direction of them while they attended the party at the Northmeade house.

**C. Aggravated Assault Convictions in Counts 16, 17, 18, and 20-25.** Noting that the nine victims in the aforementioned counts did not testify at trial, Richardson contends that although the State presented proof establishing that these victims were present during the shooting, it failed to present circumstantial proof that they reasonably feared imminent bodily injury. He claims the State presented no proof regarding the location of these victims during the shooting or their proximity to the gunfire. He also asserts that the State presented insufficient evidence that the victims in these counts showed a concern for self-defense, an inability to concentrate, a summoning of the police, or a worry about self-preservation. See State v. Barry Smith, No. 2011-02122-CCA-R3-CD, 2013 WL 6388588, at *14 (Tenn. Crim. App. Dec. 5, 2013). Although the State concedes that the victims named in these counts did not testify at trial, it argues that circumstantial evidence established the element of reasonable fear of imminent bodily injury for these victims. We conclude that the evidence was sufficient to sustain Richardson's convictions in these counts.

Regarding count 14, the State had to prove beyond a reasonable doubt that Richardson intentionally or knowingly caused bodily injury to Lemarcus Moore and used or displayed a deadly weapon. T.C.A. § 39-13-102(a)(1)(B) (Supp. 2012) (amended July 1, 2013). The proof was more than sufficient to establish Richardson's guilt of the offense in count 14. In counts 15 through 25, the State had to prove beyond a reasonable doubt that Richardson intentionally or knowingly caused the named victims to reasonably fear imminent bodily injury through the use or display of a deadly weapon. Id. Aggravated assault based on fear requires the victim to have a "well-grounded apprehension of personal injury or violence." State v. Jones, 789 S.W.2d 545, 550-551 (Tenn. 1990). "The element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." State v. Gregory Whitfield, No. 02C01-9706-CR- 00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998) (citing State v. Jamie Lee Pittman, No. 03C01-9701-CR-00013, 1998 WL 128801, at *5 (Tenn. Crim. App. Mar. 24, 1998)). Moreover, circumstantial evidence is sufficient to establish a victim's fear of imminent bodily injury. State v. Jessie James Austin, No. W2001-00120- CCA-R3-CD, 2002 WL 32755555, at *5 (Tenn. Crim. App. Jan. 25, 2002) (citations omitted).

Viewed in the light most favorable to the State, the evidence established that the victims in counts 16, 17, 18, and 20-25, who were Christopher Braxton, Kenneth Baker, Travis D. Britton, Nakia Greer, Chymia Baker, Jalon Baker, Rodney Davenport, Terriance Webb, and Cleotha Norwood, were either inside or just outside the house at 2706 Northmeade Avenue when the shooting incident occurred. Felix Williams and Robrecus

-31-

Braxton established that Christopher Braxton and Chymia Baker were present at the time the shots were fired from the Helmwood location. Robrecus Braxton also testified that Kenneth Baker, Travis D. Britton, Nakia Greer, Jalon Baker, Rodney Davenport, and Terriance Webb were present during the shooting. Lemarcus Moore, Mark Chamber, Steve Chambers, and Sonja Watkins testified that Cleotha Norwood was present when the party was fired upon.

It is well-recognized that a victim's fear may be inferred from circumstances surrounding the offense, even if the victim does not testify at trial. See Barry Smith, 2013 WL 6388588, at *14 (concluding that the non-testifying victims were in reasonable fear of imminent bodily injury when witnesses testified that these victims were inside the house at the moment the defendants began shooting and that people were "hollering" and "screaming" and were trying to find a place to hide from the "bullets flying from every angle"); State v. Szumanski Stroud, No. W2006-01945- CCA-R3-CD, 2007 WL 3171158, at *3 (Tenn. Crim. App. Oct. 29, 2007) (holding that two non-testifying victims were in reasonable fear of imminent bodily injury when the evidence showed that they had a violent altercation with the defendant at their home, that the defendant pointed a gun at one of the victims, and that the defendant fired four or five shots at the victims inside the car); State v. Harry Jamieson, No. W2003-02666-CCA-R3-CD, 2004 WL 2996910, at *8 (Tenn. Crim. App. Dec. 23, 2004) (concluding that the non-testifying victims were in reasonable fear of imminent bodily injury when other witnesses testified that the defendant pointed his gun at the victims and that the victims were "hysterical" and "crying"); Jessie James Austin, 2002 WL 32755555, at *6 (finding that the non-testifying victim reasonably feared imminent bodily injury when a witness testified the victim was aware of the defendant's threatening statements and the defendant pointed his gun at the victim).

Richardson argues that the State presented no proof regarding the location of the victims in these counts during the shooting or their proximity to the gunfire. However, Richardson is essentially making a zone of danger argument, which this court has specifically declined to apply in aggravated assault offenses. State v. Bobby Joe Young, Jr., No. M2010-01531-CCA-R3-CD, 2011 WL 6291813, at *8 (Tenn. Crim. App. Dec.14, 2011) (citing State v. James Paris Johnson, No. E2008-02555-CCA-R3-CD, 2010 WL 3565761, at *5-6 (Tenn. Crim. App. Sept.15, 2010) (noting that the zone of danger approach is applicable to reckless endangerment cases involving victims who are unaware of danger but is not applicable to aggravated assault cases based on fear because the latter offense requires that the victim have a fear or reasonable apprehension of being harmed)). Instead, the proper inquiry is whether these victims, who did not testify, had a reasonable fear of imminent bodily injury. The proof at trial showed that regardless of whether these victims were inside or outside the house at 2706 Northmeade Avenue at the time that Richardson, Kenneth Brown, and Devon Brown fired the gunshots, they reasonably feared imminent bodily injury given the appalling circumstances of this offense.

Robrecus Braxton testified that the gunfire went on for "about ten minutes . . . like it wasn't going to stop." He said that he was "terrified" and "felt like [his] life was in danger" because bullets were hitting the cars parked around the Northmeade house and "could have hit anybody." Felix Williams stated that when the gunshots began, everyone at the party began "running and screaming for their li[ves]." He said he "panicked" because the shots sounded like they "were getting closer and closer." William compared the attack to a "war zone" because the shots went on "for a long time" and because everyone inside the home was "hollering and crying." He added that he was "[s]cared for [his] life, scared for [his] family" during the incident. Mark Chambers testified that when the shooting began the people at the party ran to the back yard in an attempt to escape the bullets that were creating sparks as they hit the Northmeade house. Steve Chambers testified that shooting lasted "[a] good five, ten minutes" and that he was afraid during the incident. Lemarcus Moore, who was shot in the leg during the incident, testified that he was "really terrified" when he realized that the gunshots were being fired in his direction. Sonja Watkins testified that the shooting "seemed like it went on forever" and that she tried to get the children at the party to a safe place inside the home. Watkins said that she had bullet holes that penetrated the living room of her home, scattering drywall dust and glass from the broken windows. She also said that bullets had "knocked bricks off the walls [of her home]." Officers found evidence that more than sixty shots had been fired at the home at 2706 Northmeade Avenue during the attack and that many of these bullets had hit several cars parked around the home. Given this evidence, we conclude that a rational jury could have found that Richardson intentionally or knowingly caused the victims in these counts to reasonably fear bodily injury by firing gunshots at them. Therefore, the evidence is sufficient to support Richardson's convictions for aggravated assault in these counts.

**V.  Consecutive Sentencing.** Finally, Richardson asserts that the trial court abused its discretion by finding that he was a dangerous offender before imposing partially consecutive sentences resulting in life imprisonment plus 224 years. He contends that although the court articulated the factors in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), it failed to determine whether the proof established those factors in his case. Alternatively, he argues that if this court concludes that the trial court implicitly made the two findings under Wilkerson, then the court's finding that the extended sentence was necessary to protect the public from further crimes by him was based on a "clearly erroneous assessment of the evidence." He claims there was no need to protect the public from him for the following reasons: his criminal history consisted of only a juvenile conviction for criminal trespass that resulted in a warning letter, he graduated high school after completing a drug treatment program, he has a good relationship with his family, and he expressed remorse in his confession and allocution. Because the trial court articulated but failed to make specific findings required of the dangerous offender classification, we remand the case

to the trial court for a new sentencing hearing to consider whether the evidence in this case establishes the factors outlined in Wilkerson.

At the April 19, 2013 sentencing hearing, the State entered the presentence investigation report into evidence. Richardson made the following statement of allocution:

> Well, I just wanted to say I truly am sorry for the pain that I caused y'all, and I thank you so much more [for] forgiving me. I know I did wrong, and I've got to be punished for it. So I mean I found God in my life, and I can take my responsibility. That's all I want to say.

Although neither the State nor the defense offered any additional evidence at the sentencing hearing, both sides presented arguments regarding whether Richardson's sentences should be served consecutively. The State argued for consecutive sentencing on the basis that Richardson was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. It asserted that "there were numerous people out there that night when this shooting occurred" and that it was "amazing that no others were killed or harmed other than the ones that were named in the indictment." The defense argued that the dangerous offender classification should not be applied because all of the conviction offenses were all inherently dangerous crimes. It also argued that the circumstances in this case were not "so spectacularly different" from other cases that it warranted consecutive sentencing. The defense noted that because Richardson was twenty-two years old, the earliest he could be released on his life sentence was when he was seventy-three years old. Defense counsel remarked, "[T]o say that releasing him would be too soon [at the approximate age of seventy-three years old], that [the] population wouldn't be safe, the public would be at risk, I think that is just a stretch. There is nothing to prove that." Counsel added that Richardson would have "fifty-one years . . . of rehabilitation in the prison environment." Finally, the defense argued that Richardson was amenable to rehabilitation because he had no further problems with drugs at school after completing an alternative school for a marijuana offense, because he had been able to admit that he was "almost an alcoholic," and because he had shown remorse for his actions in his allocution. Finally, the defense recognized that Richardson's mother was present at the sentencing hearing and that Richardson had no prior offenses as an adult, which set him apart from the majority of individuals sentenced by the trial court.

In determining whether the sentences would be served concurrently or consecutively, the trial court made the following findings:

> The State is asking the Court to find that Mr. Richardson is a dangerous offender . . . . As I indicated earlier, the Court has found that Mr. Richardson

-34-

had no hesitation in committing a crime in which the risk to human life was high, and it is inherent in some of the convictions, but it does not preclude [the court from] considering those factors when the Court makes a determination as to whether or not the sentences shall be ordered to be served consecutively, and the Court does find that he had no hesitation in committing a crime in which the risk to human life was high.

[Under] State v[.] Wilkerson, . . . , 905 S.W.2d page 993, . . . this Court has to find that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high, and the Court also has to find that the following factors apply.

That the circumstances surrounding the commission of the offense are aggravated and that the aggregate length of the sentences reasonably relates to the severity of the offense for which the Defendant stands convicted and are necessary in order to protect the public from further criminal acts by the Defendant.

Under . . . State v[.] Robinson, . . . 930 S.W.2d page 78, . . . and the Robinson case and other Tennessee cases which have dealt with consecutive sentences indicate the power of the trial court to impose consecutive sentences ensures that Defendants committing separate and distinct violations of the law receive separate and distinct punishment for each . . . crime committed. The underlying principle behind consecutive sentences is not whether the sentence is logical based on age . . . of the Defendant [being] sentenc[ed] but whether a Defendant should escape the full impact of punishment for one of his offenses.

In the Robinson case, Mr. Robinson was convicted of two first-degree murders and was sentenced to life imprisonment without the possibility of parole. And in that case, the court found that Mr. Robinson should be held responsible, should be held accountable, for separate acts committed against separate victims, and the court ordered those sentences to be served consecutively. The argument in the Robinson case was that it is a physical, logical, biological impossibility, that Mr. [Robinson] should have to serve one life imprisonment [sentence] without the possibility of parole, be revived, then [have] to serve another life sentence without the possibility of parole, and the argument was that Mr. Robinson would be a very old person by the time, if he ever made parole, which he shouldn't, and that he would have to die twice in

-35-

order to serve th[ose] sentences, and the Court again made it clear that a person should be held responsible if that person commits separate offenses against separate victims, and this Court will hold Mr. Richardson [responsible] for those separate offenses that he committed against all these victims because all the victim's have a right in order to have Mr. Richardson punished separately for what he did.

Here, Richardson argues that the trial court abused its discretion when it imposed consecutive sentencing on the basis that he was an dangerous offender. In Pollard, the Tennessee Supreme Court recently held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013); see State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). The court explained that "the presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Id. at 861. It reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court imposed consecutive sentencing after finding that Richardson was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See T.C.A. § 40-35-115(b)(4). The Pollard court explained that two additional findings must be made when applying the dangerous offender classification:

"Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive

-36-

sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences."

Pollard, 432 S.W.3d at 863 (quoting Wilkerson, 905 S.W.2d at 938). Therefore, when imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must conclude that the proof establishes that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." Id. (quoting Wilkerson, 905 S.W.2d at 938). Unlike the other six subsections, the trial court must make additional findings for the dangerous offender classification because it is "the most subjective and hardest to apply." State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Richardson contends that although the court articulated the Wilkerson factors, it failed to consider whether the proof established the factors before imposing consecutive sentences. The record shows the trial court never made findings based on the proof that Richardson's aggregate sentence was "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." Wilkerson, 905 S.W.2d at 938. When faced with a similar situation in Pollard, the Tennessee Supreme Court held that the appellate court has two options:

Where, as here, the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority. Faced with this situation, the appellate court has two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences. See Bise, 380 S.W.3d at 705 & n. 41.

Pollard, 432 S.W.3d at 863-64. The Pollard court concluded that "because the considerations required under Wilkerson involve a fact-intensive inquiry . . . the better course is to remand to the trial court for consideration of the Wilkerson requirements in determining the propriety of consecutive sentencing." Id. at 864. In light of the court's decision in Pollard, we remand

-37-

the case to the trial court for a new sentencing hearing to consider whether the evidence in this case establishes the <u>Wilkerson</u> factors.

## CONCLUSION

For the aforementioned reasons, we affirm Richardson's convictions but remand the cause to the trial court for a new sentencing hearing. This hearing is limited to consideration of the factors outlined in <u>State v. Wilkerson</u>, 905 S.W.2d 933 (Tenn. 1995), to determine the propriety of consecutive sentencing in this case.

_____
CAMILLE R. McMULLEN, JUDGE